1  Lawrence A. Organ (SBN 175503)
   *larry@civilrightsca.com*
2  Navruz Avloni (SBN 279556)
   *navruz@civilrightsca.com*
3  CALIFORNIA CIVIL RIGHTS LAW GROUP
   332 San Anselmo Avenue
4  San Anselmo, California 94960
   Tel. (415) 453-4740
5  Fax (415) 785-7352
6
7  Attorneys for Plaintiffs
   VINSHIA BAKER, *et al.*
8
9                  **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12  VINSHIA BAKER, JANICE BUCKLEY,        )  Case No.:
    LOLITA HARRIS, QUENSHODA              )  UNLIMITED JURISDICTION
13  HARRIS, SHEILA HAYES, KEITH           )
    HOLLOWAY, JOSEPH JORDAN,              )
14  HENRY LINZIE, VONDA LOTT,             )  **COMPLAINT FOR DAMAGES**
    ALBERT MCCLENDON, JOYCE               )
15  MCFADDEN, ANDREXIA ROBINSON,          )  1.  **Racial Discrimination and Hostile Work**
    KENNETH ROBINSON, JAUNICE             )      **Environment- 28 U.S.C. § 1981**
16  THOMPSON, TINAE VADEN, and            )  2.  **Racial Discrimination- FEHA**
    JAMILA WALKER                         )  3.  **Racial Harassment- FEHA**
17                                        )  4.  **Violation of the Ralph Act (Civ. Code §51.7)**
             Plaintiffs,                  )  5.  **Violation of the Bane Act (Civ. Code § 52.1)**
18                                        )  6.  **Failure to Investigate and Prevent**
                                          )      **Discrimination and Harassment- FEHA**
19      v.                                )  7.  **Disability Harassment- FEHA**
                                          )  8.  **Pregnancy Discrimination- FEHA**
20  TAYLOR FRESH FOODS, INC., dba         )  9.  **Failure to Engage in the Interactive Process**
    TAYLOR FRESH, a Delaware              )  10. **Failure to Accommodate**
21  corporation; TAYLOR FARMS             )  11. **CFRA Interference**
    CALIFORNIA, INC., dba TAYLOR          )  12. **CFRA Retaliation**
22  FARMS, a Delaware corporation; and    )  13. **FMLA Interference**
    TAYLOR FARMS PACIFIC, INC., dba       )  14. **FMLA Retaliation**
23  TAYLOR FARMS, a California            )  15. **Denial of Pregnancy Disability Leave- FEHA**
    corporation,                          )  16. **Constructive Discharge**
24                                        )  17. **Wrongful Discharge**
             Defendants.                  )  18. **Intentional Infliction of Emotional Distress**
25                                        )
                                          )
26                                        )  **JURY TRIAL DEMANDED**
                                          )
27                                        )
                                          )
28

**INTRODUCTION**

Plaintiffs are current and former African-American employees of Taylor Fresh Food, Inc., Taylor Farms California, Inc. and Taylor Farms Pacific, Inc. (hereinafter collectively referred to as "TAYLOR FARMS" and "Defendants"). Plaintiffs worked at TAYLOR FARMS' Tracy, California manufacturing plant, where they were subjected to an unending cycle of racially-charged harassing and discriminatory behavior. This included everything from overt harassment, such as racial slurs, to more subtle discrimination, such as policies that served to deny African-American employees access to supervisory positions and other opportunities for higher pay. Despite their repeated pleas to TAYLOR FARMS for assistance in ending the discrimination and harassment, TAYLOR FARMS' supervisors and managers both condoned and engaged in the racially abusive behavior.

**PARTIES**

1.      Plaintiff VINSHIA BAKER (hereinafter "BAKER") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

2.      Plaintiff JANICE BUCKLEY (hereinafter "BUCKLEY") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

3.      Plaintiff LOLITA HARRIS (hereinafter "L. HARRIS") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

4.      Plaintiff QUENSHODA HARRIS (hereinafter "Q. HARRIS") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer and machine operator by Defendants.

5.      Plaintiff SHEILA HAYES (hereinafter "HAYES") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

6.      Plaintiff KEITH HOLLOWAY (hereinafter "HOLLOWAY") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

7.      Plaintiff JOSEPH JORDAN (hereinafter "JORDAN") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

1

8.      Plaintiff HENRY LINZIE (hereinafter "LINZIE") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

9.      Plaintiff VONDA LOTT (hereinafter "LOTT") is, and at all relevant times mentioned herein was, an adult resident of the state of California and employed as a general laborer by Defendants.

10.     Plaintiff ALBERT MCCLENDON (hereinafter "MCCLENDON") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

11.     Plaintiff JOYCE MCFADDEN (hereinafter "MCFADDEN") is, and at all relevant times mentioned herein was, an adult resident of the state of California and employed by Defendants as a general laborer, metal detector, and dispatcher.

12.     Plaintiff ANDREXIA ROBINSON (hereinafter "A. ROBINSON") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

13.     Plaintiff KENNETH ROBINSON (hereinafter "K. ROBINSON") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

14.     Plaintiff JAUNICE THOMPSON (hereinafter "THOMPSON") at all relevant times mentioned herein was an adult resident of the state of California and employed as a general laborer by Defendants.

15.     Plaintiff TINAE VADEN (hereinafter "VADEN") is, and at all relevant times mentioned herein was, an adult resident of the state of California and employed as a general laborer by Defendants.

16.     Plaintiff JAMILA WALKER (hereinafter "WALKER") is, and at all relevant times mentioned herein was, an adult resident of the state of California and employed as a general laborer by Defendants.

17.     Defendant TAYLOR FRESH FOODS, INC., doing business as TAYLOR FRESH, (hereinafter "TAYLOR FRESH") is, and at all relevant times mentioned herein was, a Delaware corporation doing business in California through its wholly-owned subsidiaries TAYLOR FARMS CALIFORNIA, INC. and TAYLOR FARMS PACIFIC, INC. PLAINTIFFS are informed and believe that TAYLOR FRESH conducts human resources and hiring functions for its subsidiaries and has

sufficient interaction with California employees that it is considered a joint employer or alter ego under California law.

18.     Defendant TAYLOR FARMS CALIFORNIA, INC., doing business as TAYLOR FARMS, (hereinafter "TAYLOR FARMS CALIFORNIA") is, and at all relevant times mentioned herein was, a corporation incorporated in Delaware and registered to conduct business in California. TAYLOR FARMS CALIFORNIA is a wholly-owned subsidiary of TAYLOR FRESH, and the parent company of TAYLOR FARMS PACIFIC, INC.

19.     Defendant TAYLOR FARMS PACIFIC, INC., doing business as TAYLOR FARMS, (hereinafter "TAYLOR FARMS PACIFIC") is, and at all relevant times mentioned herein was, a corporation incorporated and doing business in California. TAYLOR FARMS PACIFIC is a wholly owned subsidiary of TAYLOR FARMS CALIFORNIA, which is in turn a wholly owned subsidiary of TAYLOR FRESH.

20.     Plaintiffs are informed and believe, and based upon such information and belief allege that there exist, and at all relevant times herein existed, a unity of interest between TAYLOR FRESH, TAYLOR FARMS CALIFORNIA, and TAYLOR FARMS PACIFIC such that any individuality and separateness between and among such entities has ceased to exist, and each is the alter ego of the other.

21.     Plaintiffs are further informed and believe, and based upon such information and belief allege, that TAYLOR FRESH, TAYLOR FARMS CALIFORNIA, and TAYLOR FARMS PACIFIC are, and at all relevant times mentioned herein were, merely shells, instrumentalities, and conduits through which the other entities carried on their business in the corporate name, exercising control and dominance of such business to such an extent that any individuality or separateness of the individual entities does not, and at all relevant times herein did not, exist and that they are considered joint employers of employees who work in California.

22.     Adherence to the fiction of the separate existence of such entities would permit an abuse of trust and corporate privilege, and would sanction a fraud and promote injustice in that Plaintiffs are informed and believe, and based upon such information and belief allege, that each of the individual subsidiaries is, and at all relevant times is, inadequately capitalized and incapable of responding in damages to Plaintiffs.

## JURISDICTION AND VENUE

23.     This action is based on Plaintiffs' claims of employment discrimination against Defendants, which arise under the Civil Rights Act of 1866 (42 U.S.C. § 1981), the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601 et seq.) (FMLA), the California Fair Employment and Housing Act (Cal. Govt. Code §§ 12900, et seq.)(FEHA), the California Family Rights Act (CFRA), the Ralph Civil Rights Act (Cal. Gov. Code § 51.7), and the Bane Act (Cal. Gov. Code § 52.1). This court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

24.     This court also has supplemental jurisdiction over Plaintiffs' related state law claims under 28 U.S.C. § 1367. Plaintiffs' state law claims arise from the same common nucleus of operative facts as the underlying federal claims. Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to all parties.

25.     This Court has personal jurisdiction over defendant TAYLOR FARMS PACIFIC. TAYLOR FARMS PACIFIC is a corporation incorporated in the state of California and conducting business in the state of California.

26.     This Court has personal jurisdiction over defendants TAYLOR FRESH and TAYLOR FARMS CALIFORNIA. Both are corporations incorporated in the state of Delaware with their corporate offices and principal places of business located in Salinas, Monterey County, California.

27.     Venue is proper in this Court, because Defendants' corporate offices and principal places of business are located in Monterey County, California.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

28.     On February 14, 2017, BAKER filed her complaint with the California Department of Fair Employment and Housing (hereinafter "DFEH"). BAKER received her "Right to Sue" notice the same day.

29.     On February 14, 2017, BUCKLEY filed her complaint with the DFEH. BUCKLEY received her "Right to Sue" notice the same day.

30.     On February 14, 2017, L. HARRIS filed her complaint with the DFEH. L. HARRIS received her "Right to Sue" notice the same day.

31.     On February 14, 2017, Q. HARRIS filed her complaint with the DFEH. Q. HARRIS received her "Right to Sue" notice the same day.

32.     On February 14, 2017, HAYES filed her complaint with the DFEH. HAYES received her "Right to Sue" notice the same day.

33.     On February 14, 2017, HOLLOWAY filed his complaint with the DFEH. HOLLOWAY received his "Right to Sue" notice the same day.

34.     On April 14, 2017, JORDAN filed his complaint with the DFEH. JORDAN received his "Right to Sue" notice the same day.

35.     On March 22, 2017, LINZIE filed his complaint with the DFEH. LINZIE received his "Right to Sue" notice the same day.

36.     On March 22, 2017, LOTT filed her complaint with the DFEH. LOTT received her "Right to Sue" notice the same day.

37.     On March 22, 2017, MCCLENDON filed his complaint with the DFEH. MCCLENDON received his "Right to Sue" notice the same day.

38.     On March 22, 2017, MCFADDEN filed her complaint with the DFEH. MCFADDEN received her "Right to Sue" notice the same day.

39.     On March 22, 2017, A. ROBINSON filed her complaint with the DFEH. A. ROBINSON received her "Right to Sue" notice the same day.

40.     On April 14, 2017, K. ROBINSON filed his complaint with the DFEH. K. ROBINSON received his "Right to Sue" notice the same day.

41.     On March 22, 2017, THOMPSON filed her complaint with the DFEH. THOMPSON received her "Right to Sue" notice the same day.

42.     On March 22, 2017, VADEN filed her complaint with the DFEH. VADEN received her "Right to Sue" notice the same day.

43.     On March 22, 2017, WALKER filed her complaint with the DFEH. WALKER received her "Right to Sue" notice the same day.

44.     The administrative complaints were filed within one year of the discriminatory employment practices described therein.

1              **FACTUAL ALLEGATIONS COMMON TO ALL PARTIES**

2     45.    Plaintiffs incorporate the factual allegations set forth in the preceding paragraphs by

3 reference.

4     46.    TAYLOR FARMS is a produce and manufacturing company which provides pre-

5 packaged salads, sandwiches, and other foods to various retail outlet chains, including coffee shops like

6 Starbucks and grocery stores like Safeway.

7     47.    All sixteen Plaintiffs are, or at all relevant times mentioned herein were, African-

8 American employees of Defendant TAYLOR FARMS at TAYLOR FARMS' food processing plant in

9 Tracy, California. Plaintiffs performed various tasks, including preparing vegetables, meats, and

10 cheeses; packaging pre-prepared foods; scanning pre-packaged foods for metals and other harmful

11 materials; cleaning the manufacturing floor; and dispatching trucks for deliveries.

12     48.    Regardless of their position, Plaintiffs were subjected to harassment and discrimination

13 on the basis of their race, which worsened over the course of their employment with TAYLOR FARMS.

14 While TAYLOR FARMS, in its Tracy food processing plant, employed approximately 80 African-

15 American employees in 2015, fewer than 20 African-American employees remained at the plant as of

16 2017- largely forced out of their roles by the discrimination and harassment they endured.

17     49.    Non-African-American employees regularly directed racial slurs towards African-

18 American employees, including Plaintiffs. Both low-level employees and supervisors routinely

19 employed racist terms such as "nigger," "faggot nigger," "gay-ass nigger," "nigarette," and "monkey."

20 Spanish-speaking employees often used Spanish-language racial epithets against African-American

21 employees, such as "mono," "congo," "cucaracha," and "mayate."  In Spanish, these words are slurs

22 used to disparage individuals of African descent, and when translated into English mean ape, gorilla,

23 cockroach and dung beetle, respectively. Spanish-speaking employees also employed the slurs "negrito"

24 and "negrita," which are the Spanish-language masculine and feminine variants of "nigger."

25     50.    The repeated, regular use of slurs in the workplace, employed by both managerial

26 employees and subordinate employees, caused Plaintiffs daily distress.

27     51.    Even when the slurs were not directed at Plaintiffs, they created a hostile work

28 environment for Plaintiffs and other African-American employees, who were regularly forced to hear

the racially derogatory, humiliating and degrading language, which was offensive to them because of their race.

52.     TAYLOR FARMS also created a hostile work environment for Plaintiffs by maintaining a highly segregated workplace. Non-African-American employees, including supervisors, complained when they were assigned to work with African-American employees, including Plaintiffs. Their complaints were not based on Plaintiffs' ability to work, but were instead based on the color of Plaintiffs' skin.

53.     TAYLOR FARMS honored their employees' discriminatory requests, and reassigned Plaintiffs to different production lines or shifts. As a result, Plaintiffs were largely confined to late-night shifts, and many African-American employees, including Plaintiffs, worked only on production lines staffed by other African-American employees.

54.     Workers on lines staffed by African-American employees, including Plaintiffs, were treated less favorably than other lines staffed by non-African-American employees. While other production lines in the plant were typically staffed with six to ten employees, lines where African-American employees worked were generally staffed with two to four employees. However, African-American employees were assigned the same quantity of work as other lines.

55.     Additionally, when employees on other lines completed their work, they could relax until the end of their scheduled shift. When African-American employees completed their allotted work, they were dispatched to other lines to set up for the following shift, or assist other employees, and were not permitted the same opportunity to rest.

56.     TAYLOR FARMS knew this behavior was wrong, and sought to disguise it from their business partners. Whenever representatives of their largest customer, Starbucks, came to inspect the factory, the discriminatory behavior would promptly stop. Racial slurs were not used, and TAYLOR FARMS staffed all of their lines with a full complement of employees. Once Starbucks' representatives left the plant, however, the discriminatory and harassing behavior began anew.

57.     TAYLOR FARMS also segregated Plaintiffs and other African-American employees during rest and meal periods. Latino, Caucasian, and Filipino employees were permitted to use a

recently-updated break room near the production lines. African-American employees, including Plaintiffs, had to use an inferior, older break room that was far from the production floors.

58.     In addition to segregating its African-American employees in an inferior break room, TAYLOR FARMS inconsistently applied its restroom break and rest break policies to unfairly penalize Plaintiffs. Plaintiffs were required to wait to use the restroom until their allotted meal and rest breaks.

59.     However, TAYLOR FARMS did not provide Plaintiffs sufficient time to use the restroom during assigned breaks. Employees involved in food production were required to wear a pair of cotton gloves, a pair of blue rubber gloves, and a pair of protective cutting gloves. They then placed a pair of protective sleeves over their gloves before donning a pair of protective glasses and a protective apron. Once an employee removed their protective gear, they then had to wait in line to use the restroom for several minutes before they could don their protective gear and return to their work station.

60.     While TAYLOR FARMS maintains an official policy which states employees may use fifteen minutes for each rest break, ten minutes for their break, and a five-minute "grace period" to doff and don their protective gear, supervisors did not follow this policy with regards to Plaintiffs. Instead, Plaintiffs were criticized and disciplined if they returned from break after just eleven minutes. Latino, Caucasian, and Filipino employees were permitted to use the restroom freely, and their supervisors did not discipline them for utilizing the five-minute "grace period" to don and doff their protective gear.

61.     Additionally, TAYLOR FARMS unfairly penalized Plaintiffs and other African-American employees for minor timekeeping infractions. TAYLOR FARMS only maintained six time clocks for its hundreds of employees, and one or two of the time clocks were frequently broken. Because TAYLOR FARMS' employees took lunch breaks at the same time, Plaintiffs often had to wait in lines behind numerous other employees to clock in. Because Plaintiffs could wait for minutes at a time to clock in, it was difficult for Plaintiffs to clock back in at the proper time following breaks.

62.     Despite the long lines, TAYLOR FARMS issued written warnings to Plaintiffs for clocking in just a single minute late. When Plaintiffs attempted to avoid this issue by clocking in from their lunch breaks less than five minutes early, they were also issued written warnings by their supervisors. TAYLOR FARMS did not issue written warnings to its Latino, Caucasian, or Filipino employees for similar minor infractions.

63.     TAYLOR FARMS also inconsistently applied its attendance policies to the disadvantage of Plaintiffs and other African-American employees. TAYLOR FARMS offered employees paid vacation and sick leave, which accrued on a pro-rata basis. Where possible, employees were to request leave in advance; however, in situations where this was not practicable, employees could "call in" to ask for leave as soon as the need arose. Supervisors could then approve or deny employees' leave.

64.     Plaintiffs' requests for leave were often denied, when similar requests for leave from non-African-American employees were approved. If a supervisor was considering approving Plaintiffs' leave, the supervisor often made Plaintiffs complete additional requirements.

65.     Non-African-American employees typically received sick or medical leave after making a written request. In contrast, Plaintiffs were required to provide doctor's notes to support their requests for leave, and in some cases were not granted leave even after providing medical documentation to support their requests.

66.     When Plaintiffs' requests for leave were approved, TAYLOR FARMS penalized them for taking approved leave. Plaintiffs regularly received written warnings for taking approved leave, even in cases where TAYLOR FARMS sent Plaintiffs home due to illness.

67.     TAYLOR FARMS' policies and practices also acted to deny Plaintiffs equal access to opportunities for professional advancement.

68.     For example, each manufacturing line at TAYLOR FARMS' Tracy plant is focused on a single, highly specialized task. When employees are able to work on the same line, performing the same task, for the majority of their workdays, they are able to gain expertise and seniority. In turn, this prepares TAYLOR FARMS' employees for promotions to higher-paying supervisory roles.

69.     However, in many cases Plaintiffs were not granted the opportunity to gain this required experience and seniority. Instead, when Plaintiffs were not confined to segregated lines, they were used as "substitute" employees: forced to shift to different lines as the need arose. This precluded Plaintiffs from obtaining the experience required for advancement to higher-paid supervisory positions.

70.     Moreover, the inconsistent application of TAYLOR FARMS' policies and practices with regards to granting promotions resulted in the near-total preclusion of African-American employees, including Plaintiffs, from supervisory roles.

71.     TAYLOR FARMS informed Plaintiffs that they would only be considered for supervisory roles if they spoke fluent Spanish and English. Although speaking Spanish was not required for employees to supervise manufacturing tasks, TAYLOR FARMS justified this policy because some of their employees spoke only Spanish.

72.     However, TAYLOR FARMS promoted employees who spoke Spanish, but could not speak or write English, to supervisory roles, in violation of its own policy. This was doubly disadvantageous to Plaintiffs. In addition to being barred from receiving promotions to supervisory roles, this inconsistently applied policy made it difficult for African-American employees to communicate with their supervisors to receive feedback or learn how to perform new tasks.

73.     Plaintiffs believed this inconsistent policy was used as an improper pretext to deny African-American employees promotions to supervisory roles. Those Plaintiffs who applied for promotions were typically denied, even if the competing applicants had inferior qualifications. Many other Plaintiffs, however, did not apply for promotions for which they were qualified, believing they would be denied the opportunity because of the color of their skin.

74.     TAYLOR FARMS' treatment even had a disparate impact on Plaintiffs during their holidays. December 25th is Christmas Day, and both a national and state holiday. Plaintiffs were accustomed to spending this special day with their family and friends, who had this day off. However, TAYLOR FARMS decided to grant its employees December 24th off, rather than December 25th, because Nochebuena, or Christmas Eve in the Latino community, was a much more important day than Christmas Day.

75.     TAYLOR FARMS' actions also had a disparate impact on Plaintiffs during the company's social functions. For example, during the company's annual holiday party and summer picnic, the events were conducted entirely in Spanish. Plaintiffs could not participate in the festivities and activities, like a raffle, unless they asked their co-workers to translate.

76.     Plaintiffs routinely complained to their supervisors about the discrimination, disparate treatment, and harassment. However, TAYLOR FARMS both explicitly and implicitly ratified this behavior. For example, Line Supervisor Dulce complained when she was assigned to work with African-American employees, including Plaintiffs, and used derogatory racial slurs to describe her African-

American subordinates. The Floor Supervisor ratified Dulce's behavior by removing African-American employees from Dulce's line at her request. When TAYLOR FARMS' African-American employees complained to Plant Manager Jerry Hernandez about this issue, he failed to discipline Dulce. Instead, African-American employees assigned to Dulce's line continued to be shuffled to other parts of the plant, and subjected to racist slurs if they remained.

## VINSHIA BAKER

77.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

78.     BAKER began working at Taylor Farms on July 23, 2015. She worked as a general laborer on Line 36, performing food preparation tasks in a refrigerated environment.

79.     She became pregnant later that year, and suffered complications from her pregnancy. As a result, BAKER's doctor declared her partially disabled, and placed her on modified duty on October 2, 2015. BAKER was not permitted to lift items weighing over 15 pounds, push or pull items weighing over 25 pounds, bend, kneel, or reach overhead. Her doctor also stated that BAKER must be permitted to sit down for ten minutes every hour, have free access to the restroom at all times, and not work in a refrigerated environment.

80.     BAKER communicated this information to Floor Manager Yasmani (last name unknown), Plant Manager Hernandez, and the Human Resources Department. BAKER provided copies of her doctors' notes to explain the accommodations she required for her disability. BAKER requested that she be moved to a warmer work environment, and be permitted to use the restroom freely.

81.     For three weeks, TAYLOR FARMS took no steps to accommodate BAKER, and failed to engage in the interactive process as required by state and federal law.

82.     Instead, BAKER was denied the hourly ten-minute breaks required by her doctor, and was forced to continue working in a cold environment. BAKER's supervisors also closely monitored her restroom use, and accused her of "abandoning her job" if she took a restroom break when it was not her assigned break time. BAKER's supervisors permitted her non-African-American co-workers to use the restroom as needed.

83.     Even though BAKER provided doctor's notes explaining her need to use the restroom, Plant Manager Hernandez called her into his office several times to accuse BAKER of taking an excessive number of breaks.

84.     After three weeks, TAYLOR FARMS had still not taken steps to accommodate BAKER's pregnancy-related disability. BAKER asked Plant Manager Hernandez for an update on the status of her request, and asked if she could be moved to a warmer area in the plant. Mr. Hernandez promised to look into the issue.

85.     When Plant Manager Hernandez returned shortly thereafter, he informed BAKER that TAYLOR FARMS would "need to find somewhere for [BAKER] to be." He then sent BAKER home for the remainder of the day with pay, stating that he did not know of any available positions that would suit BAKER's need for accommodations.

86.     BAKER remained off work for an entire week without pay. Finally, Plant Manager Hernandez contacted BAKER with an ultimatum: she would only be permitted to come back to work when her doctor lifted the restrictions on working in a cold environment.

87.     BAKER was only five months pregnant at the time, and could not afford to take her maternity leave early. As a result, she asked her doctor to modify her restrictions.

88.     When she returned, Plant Manager Hernandez placed BAKER in "pack-out." Fans constantly blow cold air onto the employees in this area of the plant, and it was even colder than BAKER's previous work environment.

89.     BAKER was informed that TAYLOR FARMS did not have any other available positions that met her restrictions. However, Central Control Room, "Pasta Room," and the office area of the plant had positions available that would have met BARKER's restrictions, but no African-American employees worked in these areas. BAKER believed the company had declined to place her in one of these more desirable work areas and accommodate her work restrictions as a result of her race. BAKER also believed this was the case because non-African-American employees had been accommodated when they became pregnant in the past.

90.     Eventually, BAKER was forced to take her maternity leave early. TAYLOR FARMS was unwilling to accommodate her requests for restroom breaks or a move to a warmer environment, and she feared for her health, and the health of her unborn child.

91.     BAKER returned to work in May of 2016. Although many of her prior restrictions were lifted, BAKER's doctor issued a note stating that she was not to work in colder areas of the plant. As a result, TAYLOR FARMS placed her on Line 34, which is less cold than Line 36.

92.     However, on Line 34, BAKER was subjected to racial harassment. The crew leader stated that he "didn't want her" working on his line, because he didn't want to work with African-American employees.

93.     The other employees on the line would laugh while using slurs like "mono" and "cucaracha," and would occasionally sing the Mexican folk song "La Cucaracha" to mock African-American employees. Additionally, she heard her Latino co-workers refer to another African-American employee as a "faggot nigger" and a "gay ass nigger." BAKER found the constant use of racial slurs to be unbearable, demeaning, and offensive.

94.     BAKER complained to Plant Manager Hernandez about the constant use of offensive language and prejudicial treatment in her work area. Plant Manager Hernandez replied that he "could not take [BAKER'S] word for it." He did not perform any investigation into the alleged behavior, and no employees were disciplined for using racial slurs.

95.     Indeed, Plant Manager Hernandez participated in the prejudicial treatment. While BAKER was attending a meeting in Plant Manager Hernandez' office, BAKER'S phone rang. She excused herself, explaining that she needed to take a call from one of her children. When she returned, Plant Manager Hernandez told her, "You people always try to find a way out," in a reference to BAKER and other African-American workers.

96.     Plant Manager Hernandez then began to ask questions about BAKER's personal life—inquiring how many children she had, what her living arrangements were, and whether she was still involved with the father of her children—before beginning to pray for her. BAKER believed these statements referenced damaging and offensive stereotypes that portray African-American women as promiscuous.

97.     Eventually, in July of 2016, BAKER quit working at Taylor Farms. She could no longer bear the constant barrage of racial slurs and unequal treatment, and was no longer able to ignore TAYLOR FARMS' unwillingness to address the issue.

## JANICE BUCKLEY

98.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

99.     BUCKLEY began working at Taylor Farms in July of 2015. She was hired as a General Laborer on Lines 22 and 25.

100.    BUCKLEY instantly noticed the discriminatory treatment reserved for African-American employees. For instance, she once requested a vacation day from her supervisor, Lupita. Lupita stated that BUCKLEY was needed in the plant, and could not take the day off. Later that day, a non-African-American employee requested the same day off, and her vacation request was granted.

101.    Additionally, BUCKLEY noticed that the carts which shuttled employees between the parking lot and the packing facility never picked up African-American employees. BUCKLEY noticed that these carts often sped past African-American employees while stopping for employees of other races. Although BUCKLEY complained to DEFENDANTS' Human Resources Department, no action was ever taken.

102.    BUCKLEY was subject to more overt discriminatory treatment, as well. After having a conversation with Plant Manager Hernandez, he once walked away, loudly muttering, "Forget that monkey." "Monkey" is an insult regularly used to refer to African-American individuals.

103.    BUCKLEY suffered from a disability that required her to use the restroom frequently, and she informed her immediate supervisor of this need for an accommodation. Despite this, TAYLOR FARMS refused to accommodate BUCKLEY and refused to engage in the interactive process. BUCKLEY was forced to wait for her scheduled break times to use the restroom.

104.    BUCKLEY complained to her supervisor about these issues; however, no action was ever taken against TAYLOR FARMS' employees. Additionally, TAYLOR FARMS never took steps to permit BUCKLEY to use the restroom as needed.

105.    Because food items that fall onto the factory floor cannot be resold, employees of TAYLOR FARMS often pick up items from the factory floor to eat during their breaks. BUCKLEY once overheard Line Lead Veronica, brag to another employee, Daniel, about how she picked up salads from the floor to take home for her family. Non-African-American employees were not punished for this behavior.

106.    However, in January of 2017, BUCKLEY was issued a written warning for picking up a salad from the factory floor, taking it to the break room, and eating it during her break. After this warning was issued, BUCKLEY was suspended, pending an investigation by TAYLOR FARMS.

107.    On January 24, 2017, BUCKLEY was called to a meeting with Plant Manager Hernandez. He showed BUCKLEY a surveillance video, which depicted BUCKLEY picking up a salad from the floor and walking out of the production area. Plant Manager Hernandez stated that BUCKLEY had committed grand theft, and terminated her.

108.    BUCKLEY was shocked, because numerous non-African-American employees engaged in the same conduct and were not terminated. BUCKLEY believed the reason given for her termination was merely pretextual, and BUCKLEY believed she was terminated because of her race.

## LOLITA HARRIS

109.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

110.    L. HARRIS began working at TAYLOR FARMS in July of 2015. She worked as a general laborer on Lines 32 and 36.

111.    The harassment and discrimination was constant during L. HARRIS's tenure at TAYLOR FARMS. Her supervisor once stated, "These people shouldn't be here," in reference to African-American employees.

112.    A different supervisor, Gordo, once threw garbage and several trays at L. HARRIS in front of numerous employees. She reported this conduct to Plant Manager Hernandez, and he promised to investigate the issue and take action. However, L. HARRIS was not aware of any discipline meted out to supervisor Gordo, who continued to harass and abuse African-American employees.

113.    Later that day, while L. HARRIS was eating lunch with another employee, someone threw more garbage at her. However, L.HARRIS' back was turned to her assailant, and she could not see the culprit. When L. HARRIS complained, a nearby lead told L. HARRIS to shut up, because she could not enjoy her lunch while L. HARRIS was speaking. Plant Manager Hernandez promised to address this issue, but no action was ever taken.

114.    After complaining about this discrimination and harassment, TAYLOR FARMS retaliated against L. HARRIS. She was falsely written up for conduct she did not engage in.

115.    Although L. HARRIS was an experienced employee, she was turned down for promotions to supervisory positions. Instead, the promotions were given to less experienced employees who were not African-American.

116.    TAYLOR FARMS told L. HARRIS that she was ineligible for the promotions to supervisory positions because she did not speak both Spanish and English fluently. However, L. HARRIS knew of several supervisory employees who could speak only Spanish, and not English. L. HARRIS believed this inconsistently applied language requirement was merely a pretext to permit TAYLOR FARMS to avoid promoting African-American employees like her and the other PLAINTIFFS to higher-paid supervisory positions.

117.    L. HARRIS also faced discrimination when she received interviews. L. HARRIS applied for a promotion to the "Central Control" area of the plant. When she arrived, she learned that her interviewers had placed bets on whether she was a Filipino woman. L. HARRIS believed she was not promoted because her interviewers discovered she was African-American.

118.    L. HARRIS also experienced difficulties when she fell ill on the job. Due to a severe ear infection that precluded her from working, L. HARRIS was forced to miss 8 days of work during a 60-day period- a violation of TAYLOR FARMS' attendance policies. L. HARRIS provided doctor's notes as proof of her illness; however, Plant Manager Hernandez informed L. HARRIS that doctor's notes "did not mean anything," and refused to consider her absences excused. At no time did Plant Manager Hernandez offer L. HARRIS information concerning her rights under the FMLA or CFRA, nor did he seek additional information from L. HARRIS to determine whether her absences might constitute

qualifying leave. Instead, Plant Manager Hernandez refused to accept L. HARRIS' doctors' notes and issued L. HARRIS written warnings.

119.   Eventually, L. HARRIS became so frustrated with the continuing discrimination and harassment that she felt compelled to quit. She ended her employment with TAYLOR FARMS in April of 2017.

## QUENSHODA HARRIS

120.   PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

121.   Q. HARRIS began working as a general laborer at TAYLOR FARMS in July of 2015. She excelled at her position, and when a Line Lead position opened up, she instantly applied.

122.   Plant Manager Hernandez interviewed Q. HARRIS for the position. At the conclusion of the interview, Plant Manager Hernandez stated that he would like Q. HARRIS to complete a 30-day training period for the lead position. During that period, Plant Manager Hernandez informed Q. HARRIS that she would shadow other employees.

123.   Q. HARRIS initially shadowed another employee, Liliana. However, after several days of shadowing Liliana, Plant Manager Hernandez sent Q. HARRIS to another area of the plant- the prep station.

124.   While Q. HARRIS was working in the prep station, she performed the same duties as a lead- despite the fact that she had not been trained to work in the prep station, nor was another lead present in the prep station for Q. HARRIS to shadow. Even though Q. HARRIS was effectively working as a lead, she was not given a pay raise.

125.   After twenty-eight days, Q. HARRIS finally complained to Plant Manager Hernandez. Line Leads, she pointed out, were typically not assigned to work in the prep station. Moreover, non-African-American Line Leads were not required to undergo the thirty-day training period, nor were they required to train in the prep station.

126.   Plant Manager Hernandez stated that TAYLOR FARMS had urgently needed new Line Leads at the time the previous Line Leads had been hired, and they did not have time to complete the probationary period because TAYLOR FARMS had needed to quickly fill the positions. Now that

TAYLOR FARMS did not urgently need Line Leads, he continued, they required potential Line Leads to undergo a 30-day probationary period. He rescinded the promotion from Q. HARRIS as punishment for complaining.

127.    Two or three weeks later, however, Plant Manager Hernandez gave the promotion to another employee, Dulce. Dulce shadowed Lilly for a mere two days before she obtained the promotion, and she did not have to learn the same extensive list of tasks as Q. HARRIS.

128.    Q. HARRIS believed that Plant Manager Hernandez instituted the long, difficult probationary period to discourage her from pursuing the promotion. Q. HARRIS believed that Plant Manager Hernandez sought to discourage her from seeking the promotion because of her race, since he only subjected African-American employees to increased "mandatory" training before granting them promotions. Latino, Filipino, and Caucasian employees were granted promotions to higher-paying positions with more responsibility, without having to undergo the allegedly mandatory training periods.

129.    After being denied the Line Lead promotion, Plant Manager Hernandez offered Q. HARRIS a promotion to Machine Operators. Q. HARRIS accepted the promotion, and worked as a machine operator for her final year at Taylor Farms.

130.    Non-African-American employees working as machine operators typically had teams of eight to ten additional individuals to assist them in filling cups of sauce. However, only one to two additional employees were assigned to Q. HARRIS' line. In spite of this, Q. HARRIS was often asked to perform twice as much work as her non-African-American co-workers.

131.    Additionally, other machine operators typically had an additional one to two employees to assist them in lifting heavy plastic totes full of product. Q. HARRIS had no additional employees to assist in lifting products, and was forced to do it herself. Q. HARRIS complained to Plant Manager Hernandez about the disparities; however, no action was taken.

132.    Later that year, Q. HARRIS discovered that she could apply for a promotion in her current position. At TAYLOR FARMS, Machine Operators are divided into "levels" based on the number of machines they are able to operate. Higher "leveled" Machine Operators make more money than lower "leveled" machine operators. Q. HARRIS went to Plant Manager Hernandez, and asked what tasks she needed to perform to become a Level 2 Machine Operator. Plant Manager Hernandez informed

Q. HARRIS that she would need to learn to operate several machines at the plant before she could be granted the promotion and raise.

133.

134.    apply to become a "Level 2" Machine Operator. Although she would be allotted additional responsibilities, she would also receive higher pay. Two other Machine Operators had been promoted to Level 2 after working as Machine Operators for less time than Q. HARRIS, so Q. HARRIS believed she was eligible for the promotion.

135.    After Q. HARRIS learned to operate the machines Plant Manager Hernandez specified, he instructed her to learn to operate an additional set of machines. Q. HARRIS learned to operate the requested machines, and was again informed by Plant Manager Hernandez that she needed to learn to operate yet an additional set of machines before she would be granted the promotion. Q. HARRIS did so, and was still not granted the pay raise.

136.    During the same time period, two non-African-American machine operators ascended to the next level of pay. They did not have to learn to operate numerous additional machines to ascend to the next level of pay.

137.    Q. HARRIS believed that Plant Manager Hernandez forced her to undergo additional training to prevent her from receiving an increase in pay. Q. HARRIS believed Plant Manager Hernandez did not wish to promote her because he did not wish to promote any African-American employees to higher-paying roles with increased responsibilities.

138.    In the fall of 2016, the sole employee assigned to Q. HARRIS' line was terminated. TAYLOR FARMS refused to send additional employees to assist Q. HARRIS, and instead forced her to perform the work of ten to twelve employees on her own. Q. HARRIS believed she was forced to perform more work with less assistance because she is African-American.

139.    In October of 2016, Q. HARRIS quit working at TAYLOR FARMS. She could no longer handle the grueling physical work on her own, and she could no longer endure the discriminatory and harassing treatment of TAYLOR FARMS.

//

//

1

## SHEILA HAYES

2      140.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by

3   reference.

4      141.    HAYES began working at TAYLOR FARMS as a general laborer on Line 36 in July of

5   2015.

6      142.    TAYLOR FARMS' discriminatory behavior began during her first days on the job.

7   Although HAYES' daughter and friends worked with her at the plant, they were not permitted to speak

8   to one another during working hours. However, non-African-American employees were permitted to

9   chat with friends and co-workers during working hours.

10      143.    HAYES regularly overheard racial slurs, including "nigger," "cucaracha," and "mono,"

11   being used against African-American employees.

12      144.    While African-American employees were disciplined for singing even brief snippets of

13   songs while on the line, HAYES noticed that non-African-American employees were not disciplined for

14   singing the Mexican folk song "La Cucaracha" several times in succession. HAYES believed they sang

15   this song to mock the African-American employees.

16      145.    Like other African-American employees, HAYES was only permitted to use the restroom

17   during her scheduled break period, while non-African-American employees could use the restroom

18   freely. When HAYES complained, she was instructed to "pee in a cup" on the production floor. Non-

19   African-American employees were permitted to use the restroom freely, and were not instructed to "pee

20   in a cup" on the production floor.

21      146.    HAYES was also a victim of Supervisor Gordo, who threw trash at L. HARRIS. He

22   threw a garbage can filled with produce at HAYES a short time after he threw garbage at L. HARRIS.

23   Supervisor Gordo only singled out African-American employees for this violent harassment, and

24   HAYES believed she was targeted because of her race.

25      147.    HAYES complained to Plant Manager Hernandez about this discriminatory behavior. He

26   promised to conduct an investigation. However, even though this was Supervisor Gordo's second time

27   assaulting an African-American employee, he was not disciplined and no investigation was ever

28

COMPLAINT FOR DAMAGES

conducted. HAYES believed that HERNANDEZ did not conduct an investigation because the affected employees were African-American.

148.     HAYES typically worked in a cold environment, and was forced to dip her hands into cold water all day. TAYLOR FARMS did not provide adequate protective gear to its employees, and HAYES began to experience nerve damage in her hands. She also contracted bronchitis, and was forced to take a week off work. When she returned to work, HAYES began to feel ill again. Her doctor stated that her bronchitis had progressed to pneumonia, and placed her off work for an additional two weeks. Her doctor informed her that she should take leave every time she began to feel ill, to avoid contracting pneumonia.

149.     However, Plant Manager Hernandez and TAYLOR FARMS refused to engage in the interactive process with HAYES. When she asked Plant Manager Hernandez to accommodate her by permitting her to take intermittent leave, he stated that he "[didn't] care about [HAYES'] health."

150.     Although HAYES had provided a doctor's note detailing her need for leave, Plant Manager Hernandez and TAYLOR FARMS refused to grant her leave request, and did not inquire into whether HAYES qualified for protected leave under the CFRA, FMLA or other statutes.

151.     Latino, Caucasian, and Filipino employees were permitted to take sick leave- even without providing a doctor's note, as HAYES did. HAYES believed that she was not permitted to take intermittent leave as required by her doctor because she was African-American.

152.     In June of 2016, Plant Manager Hernandez terminated HAYES for taking too much sick time. At no time did TAYLOR FARMS engage in the interactive process with HAYES, or attempt to accommodate her disability.

## KEITH HOLLOWAY

153.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

154.     HOLLOWAY began working at Taylor Farms in July of 2015. He began as a sanitation worker, and later transitioned to a general laborer on Line 21.

155.     Although he had previous experience working in food manufacturing, HOLLOWAY was paid at a lower hourly rate than non-African-American employees performing the same kind of work.

Additionally, HOLLOWAY was denied a promotion every time he applied for promotions to a supervisory position. HOLLOWAY believed this was because of his race, as qualified African-American employees were routinely passed in favor of non-African-American employees for promotions.

156.     In early 2017, HOLLOWAY requested time off to attend the funeral of a family member. Non-African-American employees were routinely granted time off work for funerals and similar family emergencies. Despite the fact that HOLLOWAY had remaining sick and vacation time, and despite the fact that it was Taylor Farms' policy to offer employees three days for bereavement leave, HOLLOWAY's request was denied.

157.     HOLLOWAY was eventually terminated by TAYLOR FARMS on January 5, 2017 for attending his family member's funeral.

**JOSEPH JORDAN**

158.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

159.     JORDAN began working at TAYLOR FARMS in April of 2016 as a sanitation worker.

160.     After several months, JORDAN was promoted to the position of machine operator. Typically, machine operators earn more than other laborers at TAYLOR FARMS. However, JORDAN did not receive an increase in pay. He only became aware of this issue when another African-American machine operator inquired about his pay.

161.     In August of 2016, a new break room was opened which was closer to the production lines. On August 5, 2016, JORDAN attempted to access the new break room using his key card; however, the card would not work. He originally believed TAYLOR FARMS had inadvertently failed to update his badge to grant him access.

162.     Some mechanics happened to be passing by, and offered to let JORDAN in to the break room. Before they could open the door for JORDAN, the plant's security guard rushed over. The security guard stated that JORDAN was not allowed to access the new break room.

163.     JORDAN protested, but was not permitted to access the break room.

164.    JORDAN was written up for displaying "inappropriate conduct" towards the security guard and suspended for three days.

165.    Non-African-American employees were permitted to use the updated break room freely, while other African-American employees are not able to access the updated break room.

166.    JORDAN found this treatment, coupled with the other discriminatory treatment at TAYLOR FARMS, to be unbearable. He found this treatment so offensive and demeaning that he was unable to come to work for several days. However, JORDAN called TAYLOR FARMS every day to inform them he would not be able to come to work.

167.    JORDAN attempted to return for work several days later, only to discover that his employee badge did not work. TAYLOR FARMS had terminated JORDAN on October 4, 2016.

### HENRY LINZIE

168.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

169.    Plaintiff LINZIE began working at TAYLOR FARMS in June of 2016 as a general laborer.

170.    While working at TAYLOR FARMS, LINZIE witnessed a Latino co-employee calling an African-American coworker, Mr. Green, a "mayate." When Mr. Green got upset at the offending employee, he was punished and terminated. The employee who used the racist epithet remained employed. This led LINZIE to believe that he would be disciplined or terminated if he dared to protest the use of racial slurs at TAYLOR FARMS.

171.    Later, LINZIE was called a "nigger" by a co-worker in front of his supervisor, Veronica. Appalled, LINZIE asked his co-worker to repeat himself. The co-worker replied, "You nigger, yeah, I called you a nigger." Supervisor Veronica took no action.

172.    Concerned, LINZIE reported this incident to another supervisor, Hector. Supervisor Hector did not take any action, either.

173.    Finally, LINZIE reported the constant use of racial slurs to the Human Resources Department. No action was ever taken.

174.     LINZIE's last day of work at TAYLOR FARMS was on February 9, 2017. He could no longer endure the constant racist harassment. After this date, he felt that he could no longer return to work. TAYLOR FARMS terminated LINZIE on February 21, 2017.

## VONDA LOTT

175.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

176.     VONDA LOTT started working at TAYLOR FARMS on June 23, 2015 as a general laborer on Lines 31 and 34.

177.     LOTT's co-workers regularly employed racial slurs like "nigger," "negrito," and "negrita." LOTT found the constant use of offensive language distressing and upsetting. She complained to Plant Manager Hernandez, but nothing was done.

178.     Although LOTT applied repeatedly for promotions to supervisory positions, they were not granted. Instead, she watched as non-African-American employees with less experience were promoted over her. LOTT believed she was not granted promotions because she is African-American.

179.     LOTT is disabled, and takes a medication that requires her to drink large quantities of water. Although she is able to perform most necessary functions of her job without issue, she must use the restroom frequently.  LOTT communicated this information to her supervisors on several occasions.

180.     However, LOTT's supervisors refused to accommodate LOTT's disability, or engage in the interactive process. They often prevented LOTT from using the restroom outside of her scheduled break periods.

181.     During her eight-plus hour shifts, LOTT was typically only given the opportunity to use the restroom once every two or three hours, which was insufficient for her needs. When LOTT was able to use the restroom during her break periods, she often had to wait in a long line behind numerous other employees. LOTT was disciplined if she returned from her breaks even one minute late.

182.     Non-African-American employees were permitted to use the restroom as needed, regardless of whether it was time for their scheduled break- even if they did not need to use the restroom regularly for health purposes. LOTT believed TAYLOR FARMS subjected her to this draconian treatment because of her race.

COMPLAINT FOR DAMAGES

183.    In addition to refusing to accommodate LOTT, TAYLOR FARMS has also subjected LOTT to unfair disciplinary penalties. On August 12, 2015, LOTT forgot to clock out at the end of her shift. She realized the mistake, and went to correct it as quickly as possible. When she returned to clock out, Plant Manager Hernandez confronted her. He accused LOTT of "stealing company time," and issued LOTT a formal written warning.

184.    Non-African-American employees were not disciplined for similar errors. As a result, LOTT believed she was singled out for harsh treatment because of her race.

185.    In late spring of 2017, TAYLOR FARMS hired a new president. The new company president called two meetings to introduce himself to TAYLOR FARMS' employees: one meeting for the Spanish-speaking employees, and another for the English-speaking employees. After making a brief statement, he asked if any employees wanted to say anything to him.

186.    LOTT stood up and stated that she had been employed at TAYLOR FARMS for over two years and was still working in the same position. She informed him that she had not even been granted an interview when she applied for new positions. LOTT also explained that she was experiencing difficulty communicating with her supervisors, since many of her supervisors only spoke Spanish. The president seemed taken aback by LOTT's complaints, despite the numerous complaints made to Plant Manager Hernandez and the Human Resources Department.

187.    While working in Sanitation, LOTT was notified that she could leave her job for the day when the employees on the particular Starbucks-side line completed their work for the day. In approximately May 2017, the employees working on the Starbucks-side line completed their work for the day early and left. LOTT informed Plant Manager Hernandez that she was planning to leave as well, but he instructed her to stay for her entire 8 hours shift even though there was nothing left for her to do, and other employees had left prior to completing their entire 8-hour shift. Shortly thereafter, LOTT requested a job description of her duties. Mr. Hernandez refused to provide LOTT with a job description.

188.    Since July 2017, LOTT has been on workers compensation leave due to work related injuries to her hand.

//

# ALBERT MCCLENDON

189.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

190.    MCCLENDON began working at TAYLOR FARMS on July 30, 2015 as a general laborer on Lines 34 and 35.

191.    From the outset, MCCLENDON's non-African-American co-workers made it clear that they did not wish to work with African-American employees through their demeaning and disparaging language and use of racial slurs.

192.    These co-workers would not work with MCCLENDON and other African-American employees. This meant that MCCLENDON often had to perform the work of two or three individuals on his own.

193.    MCCLENDON was often tasked with carrying large pallets of tomatoes from one end of the warehouse to another. Because the pallets were large and heavy, this job was typically performed by two or three employees; however, MCCLENDON was forced to perform this task on his own. When MCCLENDON complained to Plant Manager Hernandez that his back was beginning to hurt, Plant Manager Hernandez stated that no other employees were complaining, and told MCCLENDON to "get back to work." MCCLENDON believed he was forced to perform more work with less assistance because of his co-workers' discriminatory desires to avoid all contact with African-American individuals.

194.    Because non-African-American employees often refused to work on production lines with African-American employees, the lines with African-American employees were frequently only staffed with two or three workers, compared to the usual seven or eight.

195.    Because his line was so understaffed, MCCLENDON often performed the duties of a machine operator. Machine operation is a more difficult and physically demanding job than other positions in the plant, and machine operators are typically paid at a higher rate.

196.    MCCLENDON, however, was not paid at the higher rate, and was not offered the opportunity to apply for the position, even though he was carrying out the duties of a machine operator. He believed that he was not offered the higher rate of pay because he is African-American.

197.    MCCLENDON complained that he was being misclassified as a general laborer and paid at a lower rate than other machine operators to Plant Manager Hernandez, but nothing was done.

198.    On August 25, 2016, MCCLENDON ended his employment with TAYLOR FARMS because he could no longer endure the constant racial harassment and discrimination.

## JOYCE MCFADDEN

199.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

200.    MCFADDEN began working at TAYLOR FARMS in May of 2016 as a general laborer.

201.    MCFADDEN was one of the few African-American employees promoted to be a metal detector. This job pays at a higher rate, and is therefore more desirable than other positions in the plant.

202.    However, MCFADDEN was not permitted to perform the same duties as other metal detectors. On her very first day, her supervisor, Gordo stated, "Your job is to look at the conveyor, you don't say nothing to me." He then forced her to work on the production line making sandwiches, and demanded that she sweep the floor and perform other routine cleaning tasks. MCFADDEN believed this was because of her race. Non-African-American metal detectors did not have to perform the same menial tasks.

203.    MCFADDEN was not provided a locker to store her work supplies and was forced to purchase a backpack so that she could carry the two metal detector guns and her folder with her at all times. The other metal detectors in the plant were provided a locker close to their work space area and did not have to carry the work items around with them.

204.    MCFADDEN was also unfairly punished for infractions she did not commit. For instance, MCFADDEN was falsely accused of misconduct on August 1, 2016. Although it was MCFADDEN's day off, she was written up for placing sandwiches in the incorrect pre-printed boxes- even though she was not in the plant at the time this mistake occurred.

205.    The following month, while she was on break, another employee changed the expiration date stickers that machines automatically affixed to products. Even though MCFADDEN was not on the plant floor at the time, she was held responsible for this infraction and issued a written warning on August 9, 2016.

206.    Later that month, MCFADDEN's machine broke down and continued to produce product, even when she attempted to shut it down. MCFADDEN called for a mechanic, but it took over 30 minutes for a mechanic to arrive. As a result, MCFADDEN made too much product. Despite the fact that the machine malfunction was beyond her control, MCFADDEN was suspended from work.

207.    MCFADDEN believed she was made a scapegoat for these errors because she was African-American. The other employees involved in each of these errors were not African-American, and were not disciplined.

208.    Additionally, in approximately September 2016, Gordo instructed MCFADDEN to work on a machine without providing her with the required protective gloves, that other employees used to protect their hands. As a result, MCFADDEN injured her hands and was required to go to the hospital.

209.    In December of 2016, MCFADDEN transitioned from a metal detector to a dispatcher position. Although she was no longer subjected to the constant use of racial slurs by production employees, MCFADDEN continued to experience discrimination and harassment.

210.    Because dispatchers work in the front office, MCFADDEN could see when potential applicants walked in to request job applications.

211.    MCFADDEN noticed that on January 2, 2016, an African-American man came in to enquire about open positions at TAYLOR FARMS. Another employee, Dana Sanchez, informed him that TAYLOR FARMS was not accepting any applications until April. Two days later, on January 4, 2016, MCFADDEN observed Dana give job applications to two Latino women.

212.    MCFADDEN watched as, time and time again, African-American applicants were informed the company was not hiring. Just days or even hours later, white, Latino, and Filipino applicants were told that TAYLOR FARMS was hiring and were given job applications. MCFADDEN believed this practice occurred because TAYLOR FARMS preferred not to hire African-American employees. During her first ninety days as a dispatcher, MCFADDEN estimated that TAYLOR FARMS hired twenty new Latino employees, fifteen Asian employees, and just two new African-American employees.

213.    MCFADDEN attempted to take a stand against this discrimination. When an African-American applicant came in to the office and requested an application, she personally handed him the

appropriate paperwork. When MCFADDEN's supervisor discovered this, he threatened to retaliate against her, and said he would suspend MCFADDEN.

214.    MCFADDEN countered that she had not yet received enough written or verbal warnings to merit a suspension. MCFADDEN's supervisor relented, and told MCFADDEN he would only issue a verbal warning for the issue. However, on March 29, 2017, he issued MCFADDEN a written warning.

215.    MCFADDEN received another warning for an act she did not commit on April 5, 2017, when she was issued a warning for handing a shipper a blank bill of sale. She disputes that she committed this error.

216.    Originally, MCFADDEN was told that she would receive a raise after her first ninety days on the job. However, TAYLOR FARMS used these unsubstantiated written warnings to deny MCFADDEN the increased rate of pay. Other dispatchers were not disciplined for similar behavior.

217.    MCFADDEN also receives fewer hours than other dispatchers. MCFADDEN typically works five days per week, and is not permitted to work overtime. Other dispatchers work six days per week, and are eligible for overtime.

218.    Although MCFADDEN is scheduled to work fewer hours than her non-African-American counterparts, she is still expected to take on a heavier workload. For example, in addition to her regular work, MCFADDEN was asked to assist another employee, Gerson. Gerson required assistance because his math skills were lacking. Although MCFADDEN must check, and occasionally complete, Gerson's work in addition to her own, MCFADDEN is not given overtime or additional hours. However, Gerson works six days per week and is allowed to work overtime.

219.    On approximately October 14, 2017, employees threw a party at TAYLOR FARMS in the evening. MCFADDEN was scheduled to work on that day until approximately 3:45am. When MCFADDEN was clocking out, she saw a grocery bag left behind with sodas and various food items from the party. Generally, employees take home whatever is left over from the party. MCFADDEN, believing that someone forgot to take the left-over supplies from the party, took the bag home with her. The following day, when MCFADDEN reported to work, she was suspended, and ultimately terminated for "theft." MCFADDEN explained why she took the grocery bag full of sodas and other non-valuable

food items from the party home, but she was nonetheless terminated. MCFADDEN believes she was termianted because of her race, and her complaints of race discrimination.

220.    Prior to being terminated, MCFADDEN was the only African-American dispatcher. She also received fewer hours than the other dispatchers.

## ANDREXIA ROBINSON

221.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

222.    A. ROBINSON began working at TAYLOR FARMS in July of 2015 as a general laborer on Line 38.

223.    A. ROBINSON encountered racism regularly while working at TAYLOR FARMS. For example, A. ROBINSON was once ordered to remove her nail polish, or risk being sent home. She complied, unwilling to miss work.

224.    Later, however, A. ROBINSON noticed that a Latina employee was wearing fake acrylic nails. A. ROBINSON brought this infraction to her supervisor's attention during her break period. Her supervisor replied, "You're on break now, stealing company time by bringing this to my attention." The Latina employee wore the false nails for four full days. She was asked to remove them before returning to work at the end of the fourth day, and was not threatened with being sent home.

225.    A. ROBINSON believed she was subjected to harsher enforcement of grooming policies because of her race.

226.    Similarly, A. ROBINSON was unfairly disciplined for her use of break times. To avoid getting in trouble, A. ROBINSON took care to clock in and out for break at the exact same time as her Latino, Caucasian, and Filipino coworkers. Even though all employees returned at the same time, only African-American employees, including A. ROBINSON, were written up for taking breaks that were too long.

227.    A. ROBINSON believed she was being disciplined because of her race. She complained to her supervisor about this discriminatory treatment, but no action was taken.

228.    A. ROBINSON applied for numerous promotions. She observed Latino applicants with less experience, and who only spoke Spanish, receive promotion. However, A. ROBINSON and other

African-American employees were told they needed to speak both Spanish and English fluently to receive a promotion.

229.    A. ROBINSON believed this policy was merely a pretext employed by TAYLOR FARMS to avoid promoting African-American employees to leadership roles.

230.    A. ROBINSON was repeatedly, and unfairly, disciplined over her use of accrued sick time. In late 2015, she developed bronchitis from spending her workday in a cold warehouse environment. Her physician stated that she must be allowed time off to recover, and be granted intermittent leave. When A. ROBINSON presented the note to Plant Manager Hernandez, he replied that A. ROBINSON must be "accountable" for her absences, and that he "didn't care if she presented a note."

231.    Additionally, in February of 2016, A. ROBINSON suffered a miscarriage. Although she presented a doctor's note saying she required time to heal, Plant Manager Hernandez stated that the note was "not an excuse." Plant Manager Hernandez ordered A. ROBINSON to "come to work or be fired." Out of fear for her job, A. ROBINSON returned to work.

232.    A. ROBINSON was issued written warnings for using her sick time, even when she let TAYLOR FARMS know in advance that she would need time off of work.

233.    Non-African-American employees were given time off to care for medical conditions, even if they did not provide a doctor's note. A. ROBINSON therefore believed this discriminatory treatment and refusal to grant her protected leave was because of her race.

234.    During the summer of 2016, A. ROBINSON needed to have her wisdom teeth removed. A. ROBINSON informed her supervisors of the anticipated dates for the absences, and provided a doctor's note. Her supervisors stated that the doctor's note was "not accepted," but provided no information as to why.

235.    Instead of seeking more information as required by CFRA or FMLA to determine whether any of these leaves were qualifying absences, TAYLOR FARMS terminated A. ROBINSON on August 4, 2016 for utilizing her accrued sick leave.

236.    Non-African-American employees were permitted to take sick leave without facing repeated disciplinary consequences, so A. ROBINSON believed she was unfairly terminated on the basis of her race.

**<u>KENNETH ROBINSON</u>**

237.    PLAINTIFFS incorporate the factual allegations set forth in the foregoing paragraphs by reference.

238.    K. ROBINSON began working at TAYLOR FARMS in May of 2015 as a general laborer.

239.    K. ROBINSON noticed that African-American employees were often suspended for issues beyond their control. One employee was suspended because her machine broke down, and another was suspended for taking too long in the line for the restroom.

240.    He believed these actions were discriminatory, and complained to his supervisor that African-American employees were treated like second-class citizens. However, nothing was done.

241.    In August of 2016, K. ROBINSON picked up a packet of nuts from the factory floor. Because TAYLOR FARMS cannot sell product that has fallen on the floor, he placed the packet into his pocket, intending to ask his supervisor permission to eat the nuts later.

242.    Non-African-American employees routinely pick up food from the floor and consume it, and some even take the food home for their families. Having observed this behavior in the past, K. ROBINSON assumed it was permitted.

243.    Before K. ROBINSON could ask his supervisor for permission, however, his supervisor asked K. ROBINSON if there was any food in his pockets. K. ROBINSON produced the nuts and explained that he had intended to ask for permission to eat them.

244.    Instead of being allowed to eat the nuts, K. ROBINSON was suspended, pending an investigation, and then terminated September 6, 2016.

245.    Non-African-American employees were not terminated for engaging in identical behavior.

//

//

COMPLAINT FOR DAMAGES

**JAUNICE THOMPSON**

246.    PLAINTIFFS incorporate the factual allegations set forth in the foregoing paragraphs by reference.

247.    THOMPSON began working at TAYLOR FARMS in August of 2015 as a general laborer on Line 34.

248.    Line 34, like other lines staffed by African-American employees, was understaffed, and employees on Line 34, like THOMPSON, had greater quantities of work to complete during a scheduled shift than employees working on most other lines.

249.    Line Lead Dulce complained when there were too many African-American employees working together, and was upset when she had to work with African-American employees.

250.    This treatment continued when THOMPSON was moved to the morning shift. THOMPSON was placed on a line with only three or four other employees, and given the work of ten or twelve employees.

251.    When THOMPSON complained about the lack of manpower on her line, her new supervisors were rude and dismissive, and expressed a reluctance to speak with her at all. They did not listen to or address her concerns. THOMPSON believed her supervisors ignored her complaints because she is African-American.

252.    Because there were so few employees on the new line assigned to THOMPSON, she was often forced to perform the duties of a machine operator. Machine operation is a more difficult and physically demanding job than other positions in the plant, and machine operators are typically paid at a higher rate.

253.    THOMPSON, however, was not paid at the higher rate, and was not offered the opportunity to apply for the position. She believed that she was not offered the higher rate of pay because she is African-American.

254.    THOMPSON complained to Plant Manager Hernandez about the lack of assistance on lines staffed by African-American employees. However, Hernandez took no action.

COMPLAINT FOR DAMAGES

255.     Eventually, THOMPSON felt she had no choice but to quit working at TAYLOR FARMS. August 23, 2016. The discriminatory treatment, overwhelming workload, and racist abuse were of such an extent and a degree that any reasonable African-American employee would have quit.

### TINAE VADEN

256.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

257.     VADEN began working at TAYLOR FARMS in May of 2015 as a general laborer on Line 21.

258.     Generally, Line 21 was staffed with only two other employees. However, nearby Line 27 was staffed with seven or eight other employees, despite being assigned a similar quantity of work.

259.     Although VADEN's line, Line 21, had fewer employees and an equal quantity of work, VADEN was forced to assist other production lines after completing her assigned work. Non-African-American employees on other lines were permitted to rest after completing their assigned work, and VADEN believed she was required to perform a greater quantity of work than other employees because she is African-American.

260.     VADEN's Latino co-workers often spoke of VADEN in derogatory terms in Spanish while she was listening. Even VADEN's immediate supervisors engaged in this behavior.

261.     VADEN was then terminated on August 18, 2016.

//

### JAMILA WALKER

262.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

263.     WALKER began working at TAYLOR FARMS in June of 2015 as a general laborer, and later as a metal detector.

264.     After she became a metal detector, WALKER applied for numerous promotions to supervisory positions; however, she was not appointed to any of the positions she applied for. WALKER had extensive experience in food packing and assembly-line work, and was qualified for each of the promotions for which she applied. WALKER even trained a Latina co-worker, Veronica, to operate one

of the assembly lines at TAYLOR FARMS. WALKER then watched as Veronica was promoted to the lead position for which WALKER had applied.

265.    Because WALKER had trained the eventual choice for the position, she knew that TAYLOR FARMS viewed her as a qualified and capable employee.

266.    WALKER applied three times for a position in the central control area of TAYLOR FARMS. Each time, she was passed over for the promotion, in favor of a less-experienced employee who began working at TAYLOR FARMS after her. WALKER noted that no African-American employees were promoted to work in the central control area.

267.    WALKER believed that she was not promoted because of her race. Although WALKER was told that she was not eligible for any promotions unless she could speak both Spanish and English, WALKER noticed that less-experienced employees who spoke only Spanish were promoted to the positions for which she applied.

268.    WALKER regularly heard other employees employ racist slurs at TAYLOR FARMS. Her husband was once called a "nigger" by a fellow employee. The other employee openly admitted his conduct to his supervisors, and he was not disciplined.

269.    Although employees were not disciplined for using racial slurs, WALKER was disciplined for minor infractions. For example, WALKER was once written up for eating candy on the production floor while her supervisor, who was not African-American and was eating the same candy at the same time, was not disciplined.

270.    Non-African-American employees regularly ate on the production floor, and WALKER believed she was targeted for disciplinary action because she is African-American.

271.    This discriminatory treatment continued when WALKER became pregnant in 2015. Her pregnancy was high-risk, and WALKER'S doctor issued a report stating she could only work 8 hours per day, for a maximum of 40 hours per week.

272.    WALKER provided this note to Plant Manager Hernandez. Instead of engaging in the interactive process with WALKER, or discussing her possible right to transfer to a different position or take leave, Hernandez told WALKER that she would not be permitted to leave early. He told WALKER that she had to stay until the day's work was completed, even if that took more than eight hours.

273. WALKER was forced to choose between keeping her job and protecting her unborn child. Although she did not intend to go on maternity leave until April 2016, WALKER took her maternity leave early to protect herself and her unborn child.. Her last day of work was January 11, 2016.

274. Non-African-American employees were granted accommodations when required, and were not forced to choose between keeping their jobs and protecting their health. As a result, WALKER believed that she was subjected to this harsh treatment because she is African-American.

275. After her maternity leave concluded, WALKER did not feel that she could return to TAYLOR FARMS. She believed that she would not have any opportunities for professional advancement due to the discriminatory attitudes of TAYLOR FARMS' employees, and she could no longer bear the harassing treatment.

276. Additionally, WALKER did not feel that she could return to a workplace which would force her to choose between the health of her unborn child and termination.

## FIRST CAUSE OF ACTION
## RACIAL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
### 42 U.S.C. § 1981
#### (As to all Plaintiffs)

277. PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

278. Under 42 U.S.C. § 1981, it is illegal to subject individuals to any form of discrimination and harassment on the basis of their race in the formation and performance of contracts. The at-will employment relationship is a "contract" under the meaning of this statute.

279. DEFENDANTS are, and at all times mentioned herein were, "employers" within the meaning of this statutory provision.

280. At all relevant times mentioned herein, PLAINTIFFS were individuals of African-American descent, engaged in an at-will employment relationship with DEFENDANTS.

281. DEFENDANTS have intentionally subjected PLAINTIFFS to discriminatory and harassing behavior on the basis of race and color. DEFENDANTS subjected PLAINTIFFS to the constant use of racial slurs in the workplace, refused to consider PLAINTIFFS for promotion on the

basis of race, selectively enforced attendance policies on the basis of race, segregated PLAINTIFFS in inferior work and break areas because they are African-American, and used pretextual excuses to conceal the fact that they terminated PLAINTIFFS because they are African-American.

282.    BUCKLEY, HAYES, HOLLOWAY, A. ROBINSON, and K. ROBINSON were terminated by TAYLOR FARMS. These PLAINTIFFS are informed and believe, and based thereon allege, that their race was a substantial factor in DEFENDANTS' decision to take adverse action by terminating their employment.

283.    BAKER, L. HARRIS, Q. HARRIS, JORDAN, LINZIE, MCCLENDON, THOMPSON, and WALKER were constructively discharged by TAYLOR FARMS. The constant discrimination and harassment they experienced as a result of their race, which included the frequent use of racial slurs and constant unequal treatment, was so severe and pervasive that it changed the terms and conditions of their employment. Such treatment would have been unbearable to any reasonable African-American employee, and any reasonable African-American individual would have felt compelled to leave.

284.    LOTT and MCFADDEN remain employed at TAYLOR FARMS. However, the unequal treatment they have been subjected to on the basis of their race is so severe and pervasive that it changed the terms and conditions of their employment.

285.    The above conduct by Plaintiffs' co-workers and supervisors, including Plant Manager Hernandez, was unwelcome, directed towards Plaintiffs, and part of a continuing pattern of conduct. Plaintiffs considered the conduct of TAYLOR FARMS' employees to be of an expressly racially hostile nature, and believed this conduct was directed at them because they are African-American.

286.    As a result, the conduct was offensive and oppressive, and changed the terms and conditions of Plaintiffs' employment by subjecting them to a racially hostile atmosphere. Plaintiffs attempted to protest and resist this behavior, and were disciplined, threatened with suspension, and even terminated for doing so. Plaintiffs at no time ever encouraged the hostile behavior complained of herein, or indicated in any way to Plant Manager Hernandez or any other employee of TAYLOR FARMS that this behavior was welcome. This created a hostile work environment.

287.    Plaintiffs were also aware that other African-American employees were harassed and discriminated against, which further contributed to the hostility of their work environment.

288.    The conduct of TAYLOR FARMS' employees towards Plaintiffs, coupled with TAYLOR FARMS' lack of response, caused Plaintiffs to perceive their work environment as hostile, intimidating, abusive, and offensive, and a reasonable African-American individual in PLAINTIFFS' position would have perceived the work environment as hostile, intimidating, abusive, and offensive.

289.    PLAINTIFFS complained to HERNANDEZ and other supervisory employees of TAYLOR FARMS about the racially hostile work atmosphere. TAYLOR FARMS had actual and/or constructive knowledge of the actions committed by HERNANDEZ and other employees in the workplace. However, the harassment continued long after TAYLOR FARMS and Plant Manager Hernandez received information regarding the harassment. TAYLOR FARMS retained Plant Manager Hernandez and the other offending employees, thereby ratifying their conduct. Some of these actions were conducted by TAYLOR FARMS' managing agents. Others were ratified by TAYLOR FARMS' managing agents, when Plaintiffs complained and HERNANDEZ and other supervisors took no action.

290.    The above harassing conduct violates the Civil Rights Act of 1866 (42 U.S.C. § 1981), and the public policy of the state of California, and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

291.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

292.    As a direct and consequential result of the actions and failures to act by TAYLOR FARM alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

293.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FAMRS in whom Plaintiff placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate,

malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

294.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

//

//

//

### SECOND CAUSE OF ACTION
### RACIAL DISCRIMINATION
### Cal. Gov. Code § 12940(a)
### (As to all Plaintiffs)

295.    Plaintiffs incorporate by reference the foregoing paragraphs as though fully reproduced herein.

296.    California Government Code Section 12940(a) requires all employers to refrain from discriminating against any employee on the basis of race.

297.    Defendants are, and at all times mentioned herein were, "employers" within the meaning of this statutory provision.

298.    At all times mentioned herein, Plaintiffs were individuals of African-American descent, and fully competent to perform the essential duties of their positions. Plaintiffs did competently perform their duties for Defendants.

299.    Plaintiffs are informed and believe, and thereon allege that, due to their race, TAYLOR FARMS treated Plaintiffs detrimentally by taking actions including, but not limited to, the following: permitting the use of racial slurs; terminating African-American employees for objecting to the use of racial slurs; refusing to discipline or terminate employees for the use of racial slurs against Plaintiffs; refusing to discipline or terminate employees for assaulting and battering Plaintiffs because of their race; refusing to investigate or prevent harassment and discrimination on the basis of race; applying

heightened requirements for promotions to African-American employees (including Plaintiffs) to preclude them from supervisory roles; terminating Plaintiffs for minor infractions that non-African-American employees were not terminated for; and constructively terminating Plaintiffs through their use of racial epithets and discriminatory actions.

300.    Moreover, TAYLOR FARMS' requirement that candidates for promotion speak both Spanish and English fluently was neither necessary for business, properly crafted, nor evenly applied. Instead, it was a burdensome term and condition of employment that constituted an adverse employment action, and was merely a pretext to justify TAYLOR FARMS' refusal to promote African-American employees. Non-African-American employees did not have to speak two languages to be considered for promotions.

301.    TAYLOR FARMS' non-managerial employees created this racially discriminatory working environment with the knowledge and approval of plant manager Plant Manager Hernandez. Plant Manager Hernandez even participated in the harassment and discrimination by perpetuating the inconsistent application of policies, refusing to investigate incidences of racial harassment, and calling an African-American employee a "monkey."

302.    This continued discriminatory and harassing treatment constituted a continuing pattern of violating Section 12940(a) of the California Government Code. TAYLOR FARMS' discriminatory conduct was ongoing throughout the entire duration of Plaintiffs' employment at their Tracy Plant, culminating in Plaintiffs' discharge or constructive discharge in most cases.

303.    These actions by TAYLOR FARMS constitute outrageous and unlawful conduct and discrimination under the laws of the State of California. Such outrageous conduct by TAYLOR FARMS' employees was a substantial factor in causing damage and injury to Plaintiffs. Plaintiffs allege that TAYLOR FARMS had actual knowledge of their employees' conduct, and should have known that their conduct was illegal and not otherwise protected by law. Instead of halting the illegal conduct, TAYLOR FAMRS ratified the conduct and terminated employees who complained.

304.    The above harassing conduct violates California's Fair Employment and Housing Act (hereinafter "FEHA") (Cal. Gov. Code § 12940(a)), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

305.    As a direct and consequential result of Defendants' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

306.    As a direct and consequential result of the actions and failures to act by Defendants alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

307.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

308.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

### THIRD CAUSE OF ACTION
### RACIAL HARASSMENT – HOSTILE WORK ENVIRONMENT
### Cal. Gov. Code § 12940(j)
### (As to all Plaintiffs)

309.    PLAINTIFFS incorporate the foregoing paragraphs of this by reference, as though fully reproduced herein.

310.    Under Section 12940(j) of California's Government Code, it is illegal for employers to harass employees on the basis of race, or maintain a racially harassing work environment.

311.    Defendants are, and at all times mentioned herein were, "employers" within the meaning of this statutory provision.

312.    At all times mentioned herein, Plaintiffs were individuals of African-American descent, and fully competent to perform the essential duties of their positions. Plaintiffs did competently perform their duties for Defendants.

313.    The above conduct by Plaintiffs' co-workers and supervisors, including Plant Manager Hernandez, was unwelcome, directed towards Plaintiffs, and part of a continuing pattern of conduct. Plaintiffs considered the conduct of TAYLOR FARMS' employees to be of an expressly racially hostile nature, and believed this conduct was directed at them because they are African-American.

314.    As a result, the conduct was offensive and oppressive, and changed the terms and conditions of Plaintiffs' employment by subjecting them to a racially hostile atmosphere. Plaintiffs attempted to protest and resist this behavior, and were disciplined, threatened with suspension, and even terminated for doing so. Plaintiffs at no time ever encouraged the hostile behavior complained of herein, or indicated in any way to Plant Manager Hernandez or any other employee of TAYLOR FARMS that this behavior was welcome. This created a hostile work environment.

315.    Plaintiffs were also aware that other African-American employees were harassed and discriminated against, which further contributed to the hostility of their work environment.

316.    The conduct of TAYLOR FARMS' employees towards Plaintiffs, coupled with TAYLOR FARMS' lack of response, caused Plaintiffs to perceive their work environment as hostile, intimidating, abusive, and offensive, and a reasonable African-American individual in PLAINTIFFS' position would have perceived the work environment as hostile, intimidating, abusive, and offensive.

317.    PLAINTIFFS complained to HERNANDEZ and other supervisory employees of TAYLOR FARMS about the racially hostile work atmosphere. TAYLOR FARMS had actual and/or constructive knowledge of the actions committed by HERNANDEZ and other employees in the workplace. However, the harassment continued long after TAYLOR FARMS and Plant Manager Hernandez received information regarding the harassment. TAYLOR FARMS retained Plant Manager Hernandez and the other offending employees, thereby ratifying their conduct.

318.     The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940(j)), and entitles PLAINTIFFS to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

319.     As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

320.     As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

321.     Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

322.     As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

### FOURTH CAUSE OF ACTION
### VIOLENCE IN VIOLATION OF THE RALPH ACT
### Cal. Civ. Code § 51.7
### (As to Plaintiffs L. Harris and Hayes)

323.     Plaintiffs incorporate the foregoing paragraphs by referenced, as though fully reproduced herein.

COMPLAINT FOR DAMAGES

324.    Plaintiffs L. HARRIS and HAYES are African-American women, who were employees of TAYLOR FARMS at all relevant times mentioned herein.

325.    While working at TAYLOR FARMS' Tracy plant, L. HARRIS and HAYES were subjected to violence by a supervisor, Gordo. Gordo threw trash and some trays at L. HARRIS, while he threw a full garbage can at HAYES.

326.    Based on Gordo's behavior and demeanor, L. HARRIS and HAYES believed that Gordo intended to injure them, and that his abusive behavior was not accidental.

327.    Based on Gordo's history of racially discriminatory and demeaning acts, L. HARRIS and HAYES believed that Gordo's behavior was motivated by his hatred of and prejudice towards African-Americans.

328.    L. HARRIS and HAYES reported this abusive and violent behavior to Plant Manager Hernandez.

329.    However, neither Plant Manager Hernandez nor any other agent of TAYLOR FARMS took any action to investigate this harassment, nor to prevent it from happening again. TAYLOR FARMS therefore implicitly ratified his actions, even though Gordo was violent towards African-American employees on multiple occasions.

330.    Because TAYLOR FARMS ratified Gordo's actions, TAYLOR FARMS is liable for his abusive behavior under the doctrine of *respondeat superior*.

331.    Additionally, TAYLOR FARMS is strictly liable for Gordo's actions, because he is a supervisory employee.

332.    The above harassing conduct violates the Ralph Civil Rights Act (Cal. Civ. Code § 51.7), and entitles L. HARRIS and HAYES to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

333.    As a result of Defendants' unlawful acts, Plaintiffs are entitled to recover a civil penalty of $25,000.

334.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

335.    As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

336.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

337.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

**FIFTH CAUSE OF ACTION**
**VIOLENCE IN VIOLATION OF THE BANE ACT**
**Cal. Civ. Code § 52.1**
**(As to Plaintiffs L. Harris and Hayes)**

338.    Plaintiffs incorporate the foregoing paragraphs by referenced, as though fully reproduced herein.

339.    Plaintiffs L. HARRIS and HAYES are African-American women, who were employees of TAYLOR FARMS at all relevant times mentioned herein.

340.    While working at TAYLOR FARMS' Tracy plant, L. HARRIS and HAYES were subjected to violence by a supervisor, Gordo. Gordo threw trash and some trays at L. HARRIS, while he threw a full garbage can at HAYES.

341.    This violence interfered with Plaintiffs' right to be free from harassment and discrimination, and to be employed in a workplace free from harassment and discrimination..

342.   L. HARRIS and HAYES reported this abusive and violent behavior to Plant Manager Hernandez.

343.   However, neither Plant Manager Hernandez nor any other agent of TAYLOR FARMS took any action to investigate this harassment, nor to prevent it from happening again. TAYLOR FARMS therefore implicitly ratified his actions, even though Gordo was violent towards African-American employees on multiple occasions.

344.   Because TAYLOR FARMS ratified Gordo's actions, TAYLOR FARMS is liable for his abusive behavior under the doctrine of *respondeat superior*.

345.   Additionally, TAYLOR FARMS is strictly liable for Gordo's actions, because he is a supervisory employee.

346.   The above harassing conduct violates California's Bane Act (Cal. Civ. Code 52.1), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

347.   As a result of Defendant's actions, Plaintiffs are entitled to recover a civil penalty of $25,000.

348.   As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

349.   As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

350.   Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold,

callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

351.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

//

//

//

### SIXTH CAUSE OF ACTION
### FAILURE TO INVESTIGATE AND PREVENT DISCRIMINATION AND HARASSMENT
### Cal. Gov. Code § 12940(k)
### (As to All Plaintiffs)

352.    Plaintiffs incorporate the foregoing paragraphs of the complaint as though fully reproduced herein.

353.    Under Section 12940(k) of the California Government Code, it is unlawful for an employer to fail to take all reasonable steps to investigate and prevent harassment of its employees.

354.    Defendants are, and at all times mentioned herein were, "employers" within the meaning of this statutory provision.

355.    At all times mentioned herein, Plaintiffs were individuals of African-American descent, and employees of TAYLOR FARMS.

356.    Defendants failed to take all reasonable steps to prevent discrimination and harassment against Plaintiffs from occurring, and failed to take immediate, effective, and appropriate corrective action to investigate, evaluate, and remedy any instances of alleged harassment.

357.    Plaintiffs complained, repeatedly, to their individual supervisors as well as to Plant Manager Hernandez about the harassment they endured. Even where supervisory employees witnessed the harassment, no action was taken. When employees reported the harassment to Hernandez, he stated

that he "could not" take their word as true, and refused to conduct any investigations into the harassment.

358.    Plaintiffs are informed and believe, and based thereon allege, that Defendants have never followed or enforced an effective written policy regarding racial harassment.

359.    This continued failure to investigate discriminatory and harassing treatment constituted a continuing pattern of violating Section 12940(k) of the California Government Code. TAYLOR FARMS' discriminatory conduct was ongoing throughout the entire duration of Plaintiffs' employment at their Tracy Plant, culminating in many Plaintiffs' discharge or constructive discharge.

360.    The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940(k)), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

361.    As a direct and consequential result of Defendants' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

362.    As a direct and consequential result of the actions and failures to act by Defendants alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Defendants' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

363.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

364.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

**SEVENTH CAUSE OF ACTION**
**DISABILITY DISCRIMINATION**
**Cal. Gov. Code § 12940(a)**
**(As to Plaintiffs BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER)**

365.    Plaintiffs incorporate the factual allegations set forth in the preceding paragraphs by reference.

366.    Under Section 12940(a) of the California Government Code, it is unlawful for employers to discriminate against their employees on the basis of disability.

367.    Defendants are, and at all times mentioned herein were, "employers" within the meaning of this statutory provision.

368.    At all times mentioned herein, BUCKLEY, HAYES, LOTT, A. ROBINSON and WALKER were disabled under the definition set forth under California's FEHA. Nevertheless, they could competently and safely perform their job duties with reasonable accommodations. BUCKLEY and LOTT only needed to use the restroom regularly, while HAYES and A. ROBINSON simply required intermittent leave to treat the recurrent bronchitis they developed while working for TAYLOR FARMS.

369.    TAYLOR FARMS knew of BUCKLEY, HAYES, LOTT, A. ROBINSON and WALKER's disabilities, yet subjected these Plaintiffs to discriminatory treatment on the basis of their disabilities.

370.    Plaintiffs were treated less favorably than other employees because of their disabilities. BUCKLEY and LOTT were subjected to disciplinary action and accused of "stealing company time" if they needed to use the restroom outside of their scheduled rest and break periods. HAYES and A. ROBINSON were denied a transfer to a more suitable work environment, and terminated for "excessive absences." WALKER was forced to go on unpaid maternity leave early, because Plant Manager Hernandez refused to accommodate her request for a modified work schedule of only eight working hours per day.

371.     Additionally, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER believe and thereon allege that their disabilities and need for accommodations were a substantial factor in Defendants' decision to take adverse employment action against them, in the form of issuing written warnings and terminations.

372.     The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940(a)), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

373.     As a direct and consequential result of Defendants' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

374.     As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

375.     Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

376.     As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

**EIGHTH CAUSE OF ACTION**

1
2

**PREGNANCY DISCRIMINATION**
**(Cal. Gov. Code § 12940(a))**
**(As to Plaintiffs BAKER, A. ROBINSON, and WALKER)**

3       377.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by

4  reference.

5       378.     Under Section 12940(a) of the California Government Code, it is unlawful for employers

6  to discriminate against their employees on the basis of sex. This includes discrimination on the basis of

7  pregnancy.

8       379.     DEFENDANTS are, and at all times mentioned herein were, "employers" within the

9  meaning of this statutory provision.

10      380.     While employed by TAYLOR FARMS, Plaintiffs BAKER, A. ROBINSON, and

11  WALKER were pregnant. Nevertheless, they could competently and safely perform their job duties with

12  reasonable accommodations.

13      381.     However, TAYLOR FARMS subjected BAKER, A. ROBINSON, and WALKER to

14  discriminatory treatment because of their pregnancies. TAYLOR FARMS refused to accommodate

15  BAKER and WALKER'S requests for reasonable accommodations, forcing them to choose between

16  following their doctors' orders and keeping their jobs. BAKER and WALKER were forced to go on

17  unpaid leave before their maternity leave was scheduled to start, to protect the health of their unborn

18  children. A. ROBINSON suffered a miscarriage, and was ordered to stay home and rest. A. ROBINSON

19  was forced to return to work, and was told that her pregnancy-related disability was "not an excuse" to

20  miss a day of work.

21      382.     BAKER, A. ROBINSON, and WALKER believe, and based thereon allege, that their

22  pregnancies and need for accommodations were a substantial factor in TAYLOR FARMS' decision to

23  take adverse employment action against them, in the form of issuing written warnings and terminations.

24      383.     The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940(a)), and

25  entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic,

26  exemplary, and punitive damages.

27
28

COMPLAINT FOR DAMAGES

384.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

385.    As a direct and consequential result of the actions and failures to act by Defendants alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

386.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

387.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## NINTH CAUSE OF ACTION
### FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS
#### (Cal. Gov. Code § 12940(n))
### (As to Plaintiffs BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER)

388.    PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

389.    At all relevant times herein, Section 12940(n) of the California Government Code was in force. This provision holds that it is unlawful for an employer to fail to engage in an affirmative,

interactive process to identify and implement effective accommodations for an employee with a known disability.

390.   DEFENDANTS are, and at all relevant times herein were, covered employers under this provision.

391.   Plaintiffs BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER were employees suffering from qualified disabilities at all relevant times mentioned herein.

392.   BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, AND WALKER required reasonable accommodations for their disabilities, and could have performed the essential duties of their positions with reasonable accommodations.

393.   TAYLOR FARMS refused to engage in the interactive process, and refused to even acknowledge signed notes detailing restrictions from licensed medical providers.

394.   TAYLOR FARMS instead forced Plaintiffs to work at danger to their health and well-being, and flatly denied all accommodations requested by Plaintiffs.

395.    The above conduct violates the FEHA (Cal. Gov. Code § 12940(n)), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

396.   As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

397.   As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

398.   Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed

their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

399.   As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against Defendants as fully set forth below.

//

//

//

### TENTH CAUSE OF ACTION:
### FAILURE TO MAKE REASONABLE ACCOMMODATIONS
### (Cal. Gov. Code § 12940(m))
### (As to Plaintiffs BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER)

400.   Plaintiffs incorporate the factual allegations set forth in the preceding paragraphs by reference.

401.   Under Section 12940(m) of California's Government Code, it is unlawful for employers to "fail to make reasonable accommodations for the known physical or mental disability of an applicant or employee."

402.   Defendants are, and at all relevant times herein mentioned were, covered employers under this statute.

403.   Plaintiffs BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER were employees suffering from qualified disabilities at all relevant times herein mentioned.

404.   BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER required accommodations for their disabilities, but TAYLOR FARMS refused to provide any reasonable accommodations for their disabilities.

405.   BAKER, BUCKLEY, HAYES, LOTT, A. ROBINSON, and WALKER could have performed the essential duties of their positions with reasonable accommodations.

406.     Instead, Plaintiffs were issued written warnings, forced to go on leave, or terminated for requesting accommodations.

407.     The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940(m)), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

408.     As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

409.     As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

410.     Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

411.     As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## ELEVENTH CAUSE OF ACTION
**CFRA LEAVE INTERFERENCE**
**(Cal. Gov. Code §§ 12945.2 *et seq.*)**
**(As to Plaintiffs L. HARRIS, HAYES, and A. ROBINSON)**

412.     PLAINTIFFS incorporate the factual allegations set forth in the preceding paragraphs by reference.

413.     Under Section 12945.2 *et seq.* of California's Government Code ("CFRA"), employers must provide up to twelve weeks of leave to an employee to care for their own serious medical condition, or the serious medical condition of a family member. Employers are subject to these requirements if they employ over 50 employees within 75 miles of an employee's work location, and employees are entitled to this leave if they have worked for their employer for more than 1250 hours, and for longer than one year. It is unlawful for an employer to interfere with an employee's right to take CFRA leave.

414.     Defendants are, and at all relevant times herein mentioned were, covered employers under this statute.

415.     Plaintiffs L. HARRIS, HAYES, and A. ROBINSON were covered employees at all relevant times mentioned herein.

416.     L. HARRIS required leave to treat a severe ear infection. HAYES required intermittent leave to treat her bronchitis. A. ROBINSON required leave to recover from a miscarriage, and later have her wisdom teeth removed. All three provided doctor's notes to detail their need for leave.

417.     Defendants did not inquire about their need for CFRA leave, and instead issued written warnings to L. HARRIS, HAYES, and A. ROBINSON for using their sick time. Defendants then terminated HAYES and A. ROBINSON for "excessive absences." Defendants therefore interfered with L. HARRIS, HAYES, and A. ROBINSON'S right to take leave under CFRA.

418.     The above harassing conduct violates the CFRA (Cal. Gov. Code § 12945.2 *et seq.*), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

419.     As a direct and consequential result of Defendants' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

420.     As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being,

including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

421.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against Defendants in an amount deemed proper by this Court.

422.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## TWELFTH CAUSE OF ACTION
### CFRA LEAVE RETALIATION
### Cal. Gov. Code §§ 12945.2 *et seq.*
### (As to Plaintiff HAYES)

423.    Plaintiffs incorporate the factual allegations set forth in the preceding paragraphs by reference.

424.    Under Section 12945.2 *et seq.* of California's Government Code, employers must provide up to twelve weeks of leave to an employee to care for their own serious medical condition, or the serious medical condition of a family member. Employers are subject to these requirements if they employ over 50 employees within 75 miles of an employee's work location, and employees are entitled to this leave if they have worked for their employer for more than 1250 hours, and for longer than one year. It is unlawful to retaliate against an employee for exercising the right to take CFRA-qualifying leave.

425.    Defendants are, and at all relevant times herein mentioned were, covered employers under this statute.

426.    Plaintiff HAYES was a covered employee at all relevant times mentioned herein.

427.    HAYES informed TAYLOR FARMS of her need for intermitted CFRA leave, by providing a note from her doctor detailing her need for occasional intermittent leave due to her chronic bronchitis.

428.    TAYLOR FARMS retaliated against HAYES in violation of CFRA, by issuing written warnings for the use of sick time and eventually terminating HAYES for taking an "excessive" number of sick days.

429.    The above harassing conduct violates the CFRA (Cal. Gov. Code § 12945.2 *et seq.*), and entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

430.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

431.    As a direct and consequential result of the actions and failures to act by Defendants alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

432.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

433.     As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## THIRTEENTH CAUSE OF ACTION
### FMLA LEAVE INTERFERENCE
### 29 U.S.C. §§ 2601 et seq.
### (As to Plaintiffs L. HARRIS, HAYES, and A. ROBINSON)

434.     Plaintiffs incorporates the factual allegations set forth in the preceding paragraphs by reference.

435.     The Family and Medical Leave Act ("FMLA") (29 U.S.C. §§ 2601 et seq.) requires covered employers to provide up to twelve weeks of leave to any employee whom they have employed for over twelve months, and who has worked over 1,250 hours in the preceding year. Employers may not interfere with employees' right to take leave, and employers have an affirmative duty to determine whether an employee's leave qualifies as protected leave.

436.     Defendants are covered employers as defined by the FMLA. TAYLOR FARMS employs over 50 employees within a 75-mile radius of Plaintiffs' work site.

437.     Plaintiffs L. HARRIS, HAYES, and A. ROBINSON were entitled to take protected FMLA leave. These Plaintiffs worked for TAYLOR FARMS for at least one year, and had worked at least 1,250 hours in the year preceding their need for leave.

438.     L. HARRIS required leave to treat a severe ear infection. HAYES needed to take intermittent leave to treat her chronic bronchitis. A. ROBINSON required leave to recover from a miscarriage and to have her wisdom teeth removed. All three employees provided notice to TAYLOR FARMS of their need for leave, and this notice was sufficient to trigger TAYLOR FARMS' duty to determine whether the leave was FLMA-qualifying.

439.     Instead of offering their employees any kind of leave, TAYLOR FARMS flatly denied all three plaintiffs' requests for medical leave. TAYLOR FARMS thereby interfered with their right to take protected leave under the FMLA.

440.    The above harassing conduct violates the FMLA (29 U.S.C. §§ 2601 et seq.), and entitles PLAINTIFFS to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

441.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

442.    As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

443.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

444.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

445.    WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

### FOURTEENTH CAUSE OF ACTION
**FMLA LEAVE RETALIATION**
**29 U.S.C. §§ 2601 et seq.**
**(As to Plaintiff HAYES)**

446.    Plaintiff incorporates the factual allegations set forth in the preceding paragraphs by reference.

447.    The Family and Medical Leave Act ("FMLA") (29 U.S.C. §§ 2601 et seq.) requires covered employers to provide up to twelve weeks of leave to any employee whom they have employed for over twelve months, and who has worked over 1,250 hours in the preceding year. When an employee exercises her right to take leave under the FMLA, her employer may not subject her to any adverse employment action as retaliation for exercising her right to take protected leave.

448.    Defendants are covered employers under the FMLA: they employ 50 workers within a 75 mile radius of Plaintiff's work location.

449.    Plaintiff HAYES was a covered employee under the meaning of the FMLA. HAYES had been employed by TAYLOR FARMS for over one year, and had worked 1,250 years in the preceding year.

450.    TAYLOR FARMS retaliated against HAYES for requiring intermittent FMLA leave, first by issuing HAYES written warnings for taking sick days and eventually terminating HAYES for taking an "excessive" number of absences.

451.    The above harassing conduct violates the FMLA (29 U.S.C. §§ 2601 et seq.), and entitles PLAINTIFFS to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

452.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

453.    As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

454.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified

and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

455.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

456.    WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

**FIFTEENTH CAUSE OF ACTION**
**DENIAL OF PREGNANCY DISABILITY LEAVE**
**Cal. Gov. Code §§ 12945**
**(As to Plaintiffs BAKER, A. ROBINSON, and WALKER)**

457.    Plaintiffs incorporate the factual allegations set forth in the preceding paragraphs by reference.

458.    Under California's Pregnancy Disability Leave Law (Cal. Gov. Code § 12945 (a)(3)(A)), it is unlawful for an employer to refuse an employee's request for reasonable accommodations for conditions related to pregnancy, childbirth, or a related medical condition. The employer must engage in a good-faith interactive process to determine the most appropriate accommodation, which might include a modified work schedule, a transfer to a different position, or a reduction in duties.

459.    TAYLOR FARMS is a covered employer, because it employs more than five employees.

460.    BAKER, A. ROBINSON, and WALKER were covered employees, because they were pregnant and required reasonable accommodations to continue to perform their job duties while suffering from pregnancy or a related medical condition.

461.    TAYLOR FARMS refused to accommodate BAKER, A. ROBINSON, and WALKER. BAKER and WALKER were forced to take maternity leave early, because TAYLOR FARMS refused to engage in the good-faith interactive process and accommodate their pregnancy-related disabilities. A. ROBINSON was denied leave altogether, even though she provided a doctor's note stating that she required time off to heal from a miscarriage.

462.    The above harassing conduct violates the FEHA (Cal. Gov. Code § 12945), and entitles PLAINTIFFS to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

463.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

464.    As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

465.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

466.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

467.    WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

//

//

//

//

## SIXTEENTH CAUSE OF ACTION
### CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (As to Plaintiffs BAKER, L. HARRIS, Q. HARRIS, JORDAN, LINZIE, MCCLENDON, THOMPSON, and WALKER)

468. Plaintiffs incorporate by reference all factual allegations set forth in the preceding paragraphs.

469. Plaintiffs BAKER, L. HARRIS, Q. HARRIS, JORDAN, LINZIE, MCCLENDON, THOMPSON, and WALKER were at all relevant times mentioned herein African-American employees of TAYLOR FARMS.

470. PLAINTIFFS BAKER, L. HARRIS, Q. HARRIS, JORDAN, LINZIE, MCCLENDON, THOMPSON, and WALKER endured daily harassment, intimidation, and discrimination while employed at TAYLOR FARMS. Plaintiffs are informed and believe, and based thereon allege, that they were subjected to this harassing treatment because of their race.

471. This behavior was of such a type and extent that it fundamentally altered the conditions of Plaintiffs' employment.

472. Enduring this treatment on a daily basis was so unbearable that Plaintiffs quit, because they were no longer able to bear the constant abuse. Any reasonable African-American individual in their position would have done the same.

473. Plaintiffs' constructive discharge from their employment with TAYLOR FARMS was based upon Defendants' violations of the public policy of the state of California, as clearly laid out in the California Constitution, Civil Rights Act of 1866, the California Family Rights Act, the California Fair Employment and Housing Act, and other statutes and provisions.

474. The above harassing conduct entitles Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

475. As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

476. As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being,

including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

477.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## SEVENTEENTH CAUSE OF ACTION
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (As to Plaintiffs BUCKLEY, HAYES, HOLLOWAY, A. ROBINSON, and K. ROBINSON)

478.    Plaintiffs incorporate by reference all factual allegations set forth in the preceding paragraphs.

479.    Plaintiffs BUCKLEY, HAYES, HOLLOWAY, A. ROBINSON, AND K. ROBINSON were at all relevant times mentioned herein African-American employees of TAYLOR FARMS.

480.    Plaintiffs endured daily harassment, intimidation, and discrimination while employed at TAYLOR FARMS. Plaintiffs are informed and believe, and based thereon allege, that they were terminated from their employment at TAYLOR FARMS because of their race.

481.    Plaintiffs are informed and believe, and based thereon allege, that the stated reasons provided by TAYLOR FARMS for their termination are merely pretextual excuses, devised to cloak the fact that TAYLOR FARMS terminated their employment on the basis of their race.

482.    Plaintiffs' discharge from their employment with TAYLOR FARMS was based upon TAYLOR FARMS' violations of the public policy of the state of California, as clearly laid out in the California Constitution, Civil Rights Act of 1866, the California Family Rights Act, the California Fair Employment and Housing Act, and other statutes and provisions. The above harassing conduct entitles

Plaintiffs to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

483.     As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

484.     As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against TAYLOR FARMS herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

485.     Because the above-described words and actions, among others, were spoken, carried out, or ratified by TAYLOR FARMS and managerial agents of TAYLOR FARMS in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

**EIGHTEENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(As to All Plaintiffs)**

486.     Plaintiffs incorporate the foregoing paragraphs by reference, as though fully reproduced herein.

487.     When Defendants failed to act by preventing the racial harassment or abuse, and acted through their managerial employees to perpetuate the abuse, Defendants knew that Plaintiffs would suffer extreme emotional distress 5

488.     The above harassing conduct violates the FEHA (Cal. Gov. Code § 12940 et seq), the Civil Rights Act of 1866, as amended (28 U.S.C. § 1981), the FMLA (29 U.S.C. § 2601), the Ralph Act

(Cal. Civ. Code 51.7), the Bane Act (Cal. Civ. Code 52.1), and the public policy of the state of California, among others, and entitles PLAINTIFFS to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

489.    As a direct and consequential result of TAYLOR FARMS' actions, Plaintiffs have suffered and continue to suffer special damages, including loss of front pay and benefits, and back pay and benefits, as shall be proved at trial.

490.    As a direct and consequential result of the actions and failures to act by TAYLOR FARMS alleged herein, Plaintiffs have suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Defendants herein. The value of Plaintiffs' damages for injuries to their mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this court, the precise amount of which will be proven at trial.

491.    Because the above-described words and actions, among others, were spoken, carried out, or ratified by Defendants and managerial agents of Defendants in whom Plaintiffs placed their justified and good-faith trust, and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Plaintiffs and with cold and callous disregard for Plaintiffs' rights, Plaintiffs request the assessment of punitive damages against TAYLOR FARMS in an amount deemed proper by this Court.

492.    As a result of the harassing and discriminatory conduct, Plaintiffs had to retain attorneys to prosecute this action. Plaintiffs are therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

493.    WHEREFORE, Plaintiffs pray judgement against TAYLOR FARMS as fully set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seeks judgment against TAYLOR FARMS as follows:

1.    General damages according to proof, however, no less than the jurisdictional limit of this court;

2.      Special damages in amounts according to proof, together with prejudgment interest;

3.      Exemplary and punitive damages in amounts according to proof;

4.      Civil penalties pursuant to Civil Code section 51.7;

5.      Attorneys' fees and costs pursuant to Government Code section 12965, Civil Code sections 52(b)(3) and 52.1(h), and any other applicable statute;

6.      Interest as provided by law;

7.      Costs of suit incurred herein;

8.      Injunctive relief to require TAYLOR FARMS to better train its staff on race harassment, discrimination, retaliation, and its duty to accommodate and engage in a good faith interactive process as well as conduct more thorough investigations; and

9.      For such other and further relief as the Court deems just and proper.


Dated: February 12, 2018           **CALIFORNIA CIVIL RIGHTS LAW GROUP**


By: _____
    Lawrence A. Organ (SBN 175503)
    Navruz Avloni (SBN 279556)
    Attorneys for Plaintiffs
    BAKER, ET AL.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues.

Dated: February 12, 2018          **CALIFORNIA CIVIL RIGHTS LAW GROUP**

By: _____
        Lawrence A. Organ (SBN 175503)
        Navruz Avloni (SBN 279556)
        Attorneys for Plaintiffs
        BAKER, ET AL.

69

COMPLAINT FOR DAMAGES